## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RODRIGO TREVINO**,<br>4013 8th St NW<br>Washington, DC 20011<br><br>       Plaintiff,<br><br>v.<br><br>**UNIVERSITY OF MARYLAND, COLLEGE PARK**; **DORON LEVY**; **SANDRA CERRAI**; and **RICHARD WENTWORTH**,<br>1101 Kirwan Hall<br>College Park, MD 20742,<br>Prince George's County,<br><br>      Defendants. | Case No.:_____ |

## VERIFIED COMPLAINT

Plaintiff Rodrigo Trevino ("Plaintiff" and/or "Dr. Trevino"), by and through his attorneys, White & Hilferty, P.C. and Freedman Law, LLC, hereby complains of Defendant University of Maryland, College Park ("Defendant" and/or the "University"), and Defendants Doron Levy "Levy"), Sandra Cerrai ("Cerrai"), and Richard Wentworth ("Wentworth"), upon information and belief as follows:

## NATURE OF THE CASE

1.     Plaintiff brings this action alleging that Defendant has violated Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-2000e, *et seq.*, Maryland Code Ann., State Gov't § 20-606, *et seq.*, Prince George's County Code § 2-222, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and seeks damages to redress the injuries he has suffered as a result of being discriminated and retaliated against based upon his race, national origin, and related engagements in protected activity.

1

## JURISDICTION & VENUE

2.      Jurisdiction of this Court is proper under 42 U.S.C. § 2000e *et seq.* and 28 U.S.C. §§ 1343.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as it is a judicial district in which a substantial part of the underlying events or omissions giving rise to Plaintiff's claim occurred.

## PROCEDURAL REQUIREMENTS

4.      On June 16, 2023, Plaintiff filed a Charge of Discrimination (Charge No.: 531-2023-04245) with the Equal Employment Opportunity Commission ("EEOC").  The Charge of Discrimination was cross-filed with the local Fair Employment Practice Agency, Prince George's County Office of Human Rights, and the Maryland Commission on Civil Rights, pursuant to Workshare Agreements with the EEOC.

5.      On March 11, 2024, Plaintiff filed an Amended Complaint (Charge No.: 531-2023-04245) with the EEOC.  The Amended Complaint was cross-filed with the Prince George's County Office of Human Rights and with the Maryland Commission on Civil Rights.

6.      On April 18, 2024, pursuant to Work Sharing Agreements, the EEOC transferred Plaintiff's case to the Maryland Commission on Civil Rights for further processing and investigation.

7.      On September 24, 2024, the U.S. Department of Justice Civil Rights Division issued a Notice of Suit Rights in connection with the above-referenced Charges.

8.      Plaintiff has filed this action within 90 days of receipt of the Determination and Notice of Suit Rights.

## THE PARTIES

9.      At all relevant times, Plaintiff was and is a resident of Washington, D.C. During the relevant time period herein, Defendant employed Plaintiff as an Assistant Professor at its location in Prince George's County, Maryland.

10.     At all relevant times, Defendant University of Maryland, College Park was and is a public university of the State of Maryland, with its principal place of business at 1101 Kirwan Hall, College Park, MD 20742.

11.     At all relevant times, Defendant Doron Levy was a professor employed by Defendant University.

12.     At all relevant times, Defendant Sandra Cerrai was a professor employed by Defendant University.

13.     At all relevant times, Defendant Richard Wentworth was a professor employed by Defendant University.

## MATERIAL FACTS

14.     Dr. Trevino is a Mexican American male.

15.     During Summer 2017, Defendant University hired Dr. Trevino as an Assistant Professor in the Department of Mathematics at its location in College Park, Maryland.  Throughout his employment, Dr. Trevino performed his job duties in an exemplary manner.

16.     During his tenure in the Math Department, Dr. Trevino repeatedly opposed Defendant University's discriminatory employment practices within the Department of Mathematics. For example, in Spring 2020, Dr. Trevino emailed Chair of the Math Department Dr. Doron Levy and then-Chair of the Department of Mathematics' Appointment, Promotion, and Tenure ("APT") Committee Professor Sandra Cerrai expressing concern about equity in the

Department's hiring practices, in addition to concerns about the treatment of a junior female Professor. Furthermore, in November 2021, Dr. Trevino contacted the Dean's Office about concerns regarding the equity in the hiring practices during that year, when Professor Richard Wentworth was the Chair of the APT Committee. Nevertheless, Defendant University dismissed Dr. Trevino's concerns and commenced a pattern of discriminatory and retaliatory actions against him.

17.     During Spring 2021, Dr. Trevino's contract came up for renewal. On May 6, 2021, Levy recommended to Dean Amitabh Varshney that Dr. Trevino's contact be renewed. Levy noted that Dr. Trevino's papers "appear in good journals in dynamical systems and mathematical physics" and that "the overall record of Dr. Trevino suggests that he is making good progress with regards to the promotion criteria of the department."

18.     On December 13, 2021 the National Science Foundation (NSF) awarded Dr. Trevino with the prestigious CAREER grant.

19.     On March 10, 2022, Dr. Trevino received an offer for an Associate Professor position at another university. Around the same time, Dr. Trevino's wife, who was a Professor in another Department at the University, received an employment offer from the same university. During spring semester 2022, Defendant University engaged in retention negotiations with Dr. Trevino and his wife in an effort to retain their employment. During these negotiations, Levy expressed to Dr. Trevino that given the prestigious CAREER Award and the external offers, he would recommend Dr. Trevino for tenure.

20.     On April 5, 2022, Levy represented to the Director of Finance and Operations stating, "[Trevino] is supposed to be considered for promotion to Associate Professor with tenure in a year. With his outside offer, it will make sense to consider him for promotion this summer. It

is my expectation that this promotion case will go through smoothly through the different layers of evaluation, in particular in view of his recent NSF Career Award that [Trevino] received this year." On April 19, 2022, Levy sent Dr. Trevino a retention offer, including a salary increase and research funds.

21.      On April 29, 2022, Levy and Dr. Trevino met with Dean Varshney to discuss the retention offer. During the meeting, Dean Varshney expressed that Dr. Trevino should remain at the University because promotion to tenure was imminent and he had a bright future at the University.

22.      On May 4, 2022, based on the encouragement from Levy and Dean Varshney to remain employed by the University because he would soon be promoted, Dr. Trevino and his wife decided to remain employed by the University and rejected the offers received from another university. Later that day, Dr. Trevino informed Levy that he decided to reject the external offer and remain employed at the University.

23.      In May 2022, Dr. Trevino, encouraged by Dean Varshney and Levy, began the promotion process. Levy approved the choice of an advisory subcommittee for Dr. Trevino's tenure case, which would gather material and make recommendations.

24.      During May and June 2022, Levy and the Department selected several external evaluators to write letters for Dr. Trevino's case.

25.      Thereafter, Dr. Trevino submitted a proposal for a "new competitive grant program to award funding to educational projects that focus on expanding active and experiential learning." On June 8, 2022, Levy wrote a letter of support for Dr. Trevino's proposal.  On July 28, 2022, the Teaching & Learning Transformation Center at the University informed Dr. Trevino that his

proposal had been awarded a Teaching & Learning Grant to fund a course on experimental mathematics that Dr. Trevino developed.

26.     On August 21, 2022, a Professor nominated Dr. Trevino for the Department's Equal Employment Opportunity ("EEO") position, stating a need for someone who is more proactive about equal opportunity.  Soon after, Levy requested that the Professor rescind the nomination and approached other members of the Department to convince them not to vote for Dr. Trevino. Ultimately, Dr. Trevino was not voted for EEO officer that year.

27.     On August 25, 2022, Defendant assigned Dr. Trevino as the course coordinator of MATH 246. This role came with significant administrative and mentoring responsibilities and Defendant previously assigned the role solely to either tenured faculty or professional track faculty, not to untenured tenure-track faculty.

28.     On September 9, 2022, Levy met with Dr. Trevino to discuss the tenure case. Levy stated that all of his tenure letter writers recommended tenure, but expressed concern about a set of student evaluations from MATH 246 during spring 2022 semester. Levy then suggested Dr. Trevino consider withdrawing from the tenure process for 2022, and to try again in the next year. Dr. Trevino communicated to Levy that any concerns would be alleviated by a review of the class recordings. Dr. Trevino also pointed out that the response rates for the evaluation were very low and reminded Levy about a previous discussion they had on how some accommodations set up for the COVID-19 Omicron wave backfired, contributing to the low evaluations. Levy was familiar with Dr. Trevino's student evaluations when Dr. Trevino commenced the role of course coordinator to which Levy had appointed him. Dr. Trevino's supervisory role over the same course was evidence that the Department did not interpret his student evaluations as a legitimate concern about his teaching. Dr. Trevino communicated his intent to remain active in the promotion process.

29.     In late September 2022, the Advisory Subcommittee submitted its report to the Department's APT committee, recommending the promotion of Dr. Trevino to Associate Professor with tenure. The report stated, in part, "We recommend the promotion of Dr. Rodrigo Trevino to the rank of Associate Professor with tenure…Dr. Trevino was hired as Assistant Professor in 2017…[h]is successful research program has received strong international recognition, his teach has been strong and his service has been outstanding…[h]e has easily fulfilled the criteria for promotion to Associate Professor with tenure."

30.     Dr. Trevino was undoubtedly qualified for a grant of tenure.  He possessed a Bachelor of Science degree in mathematics from the University of Texas and a PhD in mathematics from the University of Maryland.  While employed at Defendant University, multiple leading journals in his field have published his articles; secured five distinct research grants from the National Science Foundation, one research grant from the Simon's Foundation, and one teaching grant from the Teaching & Learning Transformation Center; developed two innovative courses for the Defendant University; served on multiple department committees and conference/seminar organizing committees.  He also went above and beyond his duties by serving as faculty advisor for the Girls Talk Math summer camp for high school students.  As a testament to his abilities, two of his mentees have gone on to secure a tenure-track professorship and post-doctoral position, respectfully.  Two separate and independent departmental advisory subcommittees evaluated two sets of external recommendations, Trevino's work, and the Department's promotion criteria, and each determined that he exceeded all criteria to merit promotion.

31.     In October 2022, the APT Committee met to discuss Dr. Trevino's promotion.

32.     On October 25, 2022, Levy emailed Trevino stating, "It is imperative that we meet in the next couple of days, before Friday."  On October 26, 2022, Dr. Trevino met with Levy via

Zoom. Levy informed Dr. Trevino that, although he received more than a majority of positive votes, he did not have enough faculty votes to obtain a recommendation from the APT Committee and strongly encouraged Dr. Trevino to withdraw from the tenure process, claiming that continuing the process would not look good at higher levels of review and a denial would result in termination of Dr. Trevino's employment. Levy failed to inform Dr. Trevino that, should the candidate have their department's Chair recommendation, the candidate may withdraw from the tenure process at any point thereafter before being terminated. At no point during this meeting did Levy inform Dr. Trevino that he was not supportive of his promotion application.

33.    On October 27, 2022, Dr. Trevino emailed Levy expressing his wish to withdraw from the promotion process, which Levy acknowledged.

34.    On October 30, 2022, after reviewing the Defendant University's promotion policies, Dr. Trevino emailed Levy stating he no longer wished to withdraw from the promotion process. Per Defendant University's promotion policies, to move from the Department level to the college-level committee, the promotion candidate has to receive *either* a recommendation from the Chair of the Department or from the Department APT Committee. Dr. Trevino reminded Levy of their discussions in his retention meeting and asked Levy to support him by officially recommending Dr. Trevino for tenure. Levy replied that he would not support Dr. Trevino for promotion, citing the APT Committee's decision or student feedback survey data for a single course.  According to the guidance from the Office of Faculty Affairs, the chair's recommendation should be based on the candidate's work; it should not be based entirely upon either the APT Committee's decision or solely upon student feedback survey data. When Levy refused, Dr. Trevino withdrew from the promotion process. Levy advised Dr. Trevino to improve his teaching

and obtain new external letters for the following year, despite his current external letters all recommended promotion and tenure.

35.    During the following weeks, Levy repeatedly expressed to other professors his unwillingness to support Dr. Trevino, citing the single set of student evaluations and the false narrative that Dr. Trevino's employment would be terminated if he continued further.

36.    On November 7, 2022, Dr. Trevino met with Associate Provost for Faculty Affairs John Bertot, who oversaw all promotion-related issues on campus, to discuss his promotion case. Dr. Trevino asked about the independence requirement of the Chair's review and whether the faculty vote given as a reason for Levy's refusal violated this requirement. Dr. Trevino discussed the APT guidelines, departmental promotion criteria, the hostile work environment, and his fear of retaliation from Levy.  Associate Provost Bertot agreed to investigate further.

37.    In November 2022, Dr. Trevino discovered that he had been subject to differential treatment with respect to his teaching assignments since Professor Levy had been department chair. Ten other tenure-track faculty, who taught during the same time as Dr. Trevino, were not required to teach as many lower-level classes, where Dr. Trevino received the set of low student evaluations, as Dr. Trevino had been required to do. The University's promotion guidelines provide special consideration for a candidate's unusual teaching load if it consists of unpopular required courses. During the time of Dr. Trevino's employment, Defendant University promoted six assistant professors to tenure having taught such a class either zero or one time. Defendant University required Dr. Trevino to teach this type of class four times, and subsequently blocked Dr. Trevino's promotion due to the evaluations he received from one semester of this type of class. Levy refused to support Dr. Trevino because of his student evaluations the very same semester Levy appointed

Dr. Trevino to be the course coordinator, against Defendant University's written recommendations on how to use student evaluations.

38.     Subsequently, because of the observed double standard, Dr. Trevino engaged in protected activity by filing a complaint against Levy through Defendant University's Office of Civil Rights and Sexual Misconduct ("OCRSM") for discrimination and retaliation.

39.     On November 21, 2022, Dr. Trevino met with Associate Provost Bertot to inform him of the filed complaint and the disparate treatment between Dr. Trevino and his peers. Dr. Trevino reiterated concerns from their previous meeting and stated that Defendant University did not provide the promotion criteria prior to starting his tenure case. Associate Provost Bertot agreed to investigate and mentioned talking to the Provost regarding Dr. Trevino's allegations.

40.     On November 22, 2022, Dr. Trevino met with OCRSM representatives regarding his discrimination and retaliation complaint.

41.     On December 6, 2022, OCRSM issued a notice of investigation, considering the complaint plausible. Dr. Trevino immediately responded to correct the factual errors contained in the notice. On December 12, 2022, OCRSM issued an amended notice of investigation, correcting the errors Dr. Trevino highlighted.

42.     On December 13, 2022, a faculty member contacted Dr. Trevino to discuss a conference in May 2023, which featured someone who previously sexually harassed her. Dr. Trevino advised said faculty member to reach out to Levy, as Department Chair and Director of the Brin Mathematics Research Center ("Brin Center"), regarding her claims.  Levy purportedly dismissed her concerns. The faculty member replied to Dr. Trevino stating she would not attend the conference due to these concerns.

43.     On December 14, 2022, Dr. Trevino emailed Levy and the Advisory Board of the Brin Center requesting they address the sexual harassment concerns and suggested implementing some measures to ensure a harassment-free environment. Levy responded that he was unaware of the harassment claim and dismissed the request.

44.     On December 15, 2022, Dr. Trevino received a notification that he would be honored and recognized at the Maryland Research Excellence Celebration the following year. Dr. Trevino later learned Levy submitted the nomination prior to Dr. Trevino's engagement in protected activity that semester.

45.     At the end of the Fall 2022 semester, Dr. Trevino earned high marks on his student evaluations, including the MATH 246 class.

46.     In late December 2022, Dr. Trevino submitted 57 pages of supporting documentation in connection with his discrimination and retaliation complaint filed with OCRSM.

47.     On January 20, 2023, during a meeting, representatives from OCRSM stated that they were not looking into the course assignment data or at any other junior faculty's student evaluations. Dr. Trevino stressed the importance of the data to prove the disparate treatment between him and his peers.

48.     On February 4, 2023, Professor Giovanni Forni informed Dr. Trevino about threats Levy had made against Dr. Trevino. On the same date, Dr. Trevino contacted a mental health professional regarding work-related anxiety, depression, sleeplessness, and stress he endured as a result of the Defendant University's ongoing discrimination and retaliation.

49.     On February 6, 2023, OCRSM concluded its investigation into Dr. Trevino's complaint filed against Levy. The report did not include data regarding Dr. Trevino's complaint of disparate treatment, instead relying primarily on testimony from Levy. In the testimony, Levy

stated that Dr. Trevino did not publish often or in "particularly good journals," which contradicted his recent retention of Dr. Trevino, and his recent nomination of Dr. Trevino for the Celebration of Research Excellence.

50.     On February 8, 2023, Professor Forni reported a conversation he had with Levy to Angela Nastase from OCRSM. Professor Forni sent a follow up email to Nastase stating that Levy, "threatened to sue Trevino for damages to his career and future compensation; that he had checked with the University administration that suing Trevino for lying or damages would not be considered retaliatory; that Trevino might become unemployable in academia as a consequence of being sued; that he had a good case that he was targeted by Trevino's lies because he (Doron Levy) is Jewish; that Trevino should get a psychological evaluation; that Trevino's tenure case failed as a consequence of Trevino's 'sloppiness.'" Upon information and belief, OCRSM did nothing in response to Levy's retaliatory threats.

51.     On February 10, 2023, Dr. Trevino appealed the decision of his OCRSM complaint, referencing the failure of investigators to accumulate data on the claims and relying on testimony instead of written records and documents. Dr. Trevino's appeal also included a list of the events and documents that demonstrate the insincerity of Levy's testimony regarding Dr. Trevino's research.

52.     On February 28, 2023, Dr. Steve Fetter, who was the Dean of the Graduate School at the time and had been asked by OCRSM to look into the appeal, denied Dr. Trevino's appeal and affirmed the February 6, 2023, notice of finding.

53.     During the Spring 2023 semester, Dr. Trevino enrolled in two teaching communities, hosted by the Teaching & Learning Transformation Center, to improve his teaching.

During this time, Levy further retaliated against Dr. Trevino by repeatedly making disparaging comments about him.

54.    On February 14, March 1, and March 3, 2023, Dr. Trevino contacted Associate Provost Bertot requesting a meeting. Associate Provost Bertot did not respond to any of the requests despite being the only person to whom concerned candidates are directed to contact regarding tenure-related cases within the University.

55.    On March 8, 2023, Dr. Trevino contacted the campus Ombudsperson requesting intervention to facilitate a reply from Associate Provost Bertot.

56.    On March 13, 2023, Ombudsperson met with Dr. Trevino regarding his March 8, 2023, request.  After the Ombudsperson intervened, on the same day, Associate Provost Bertot responded to Dr. Trevino's emails and agreed to meet.

57.    On March 17, 2023, Dr. Trevino informed Associate Provost Bertot that he intended to bring a professor to the meeting as a witness. Associate Provost Bertot responded that he would not have a meeting with a witness and would no longer discuss aspects of Dr. Trevino's withdrawn tenure case. In a follow up email, Dr. Trevino requested information on the possible violations Associate Provost Bertot said he would investigate the previous semester; however, Associate Provost Bertot declined to respond substantively to Dr. Trevino's inquiries because Dr. Trevino had made a complaint through OCRSM. As such, Associate Provost Bertot would not afford the same opportunity to Dr. Trevino as he would have to others but-for Dr. Trevino's protected activity.

58.    On March 28, 2023, the Maryland Research Excellence celebration took place and honored, among others, Dr. Trevino for their research accomplishments.

59.     On April 13, 2023, Dr. Trevino received a notification that he would be awarded the 2023 Champion of Women award from University of Maryland President's Commission on Women's Issues for his general advocacy for women's issues at all levels of the academic world.

60.     On April 27, 2023, University of Maryland's Senior Vice President and Provost Jennifer King Rice presented Dr. Trevino the 2023 Champion of Women award. In a panel discussion during the award ceremony, Dr. Trevino was outspoken about the climate for women both in his department and college. Provost Rice was present during such discussion, and Dr. Trevino was approached at the end of the event by Associate Dean Robert Infantino to discuss some of Dr. Trevino's concerns at the college level.

61.     On May 8, 2023, Dr. Trevino informed Dean Varshney of the retaliatory behavior from Levy and the Math Department's failure to afford him a fair promotion process. Dean Varshney informed Dr. Trevino that Levy nominated him for the Maryland Research Excellence Celebration. Dean Varshney encouraged Dr. Trevino to report the retaliatory behavior to Professor Joshua Singer, Chair of Professor Levy's Renewal Committee, and to meet with Associate Dean John Fourkas to discuss his situation.

62.     On May 12, 2023, Dr. Trevino met with Professor Singer regarding Levy's discriminatory actions during Dr. Trevino's tenure case, the subsequent retaliation to which he was subjected by Levy, and Levy's general hostility toward Diversity, Equity, and Inclusion concerns and initiatives within the Math Department. Several other professors also met with Professor Singer to report similar concerns about Levy.

63.     On May 31, 2023, Dr. Trevino met with the Associate Dean of Faculty Affairs John Fourkas to report the discrimination and retaliation to which he was subjected by Levy. During the meeting, Associate Dean Fourkas informed Dr. Trevino that Defendant University would require

14

a new set of tenure letters and any names that were considered as letter writers the previous year would be disqualified, effectively requiring Dr. Trevino to secure double the number of positive letters than any other candidate.

64.    On June 16, 2023, Dr. Trevino engaged in further protected activity by filing an official Charge of Discrimination against Defendant University with the EEOC (and listing the Prince George's County Office of Human Rights/Maryland Commission on Civil Rights for cross-filing).

65.    On July 5, 2023, Dean Varshney reappointed Levy as Chair of the Math Department for another five-year term.

66.    On July 18, 2023, during a meeting with Associate Dean Fourkas, Dr. Trevino requested that Levy be disqualified from the promotion process, citing the discriminatory and retaliatory behavior and previous threats against Dr. Trevino, which was reported in February 2023. Associate Dean Fourkas stated that the University would not remove Levy and that the only way Levy would not serve as Trevino's supervisor for the APT review would be if Levy voluntarily recused himself. Associate Dean Fourkas also noted that he, Associate Provost Bertot, and the University Counsel requested Levy to step down. Associate Dean Fourkas asked Dr. Trevino to avoid engaging in any conduct that would trigger Levy.  Dr. Trevino noted the double burden of the Defendant University's actions, by requiring Dr. Trevino to find new letter writers, while not decisively removing Levy from the promotion process as a conflict of interest. Neither decision was grounded in Defendant University's APT Policy.  Both decisions adversely affected Dr. Trevino's promotion case.

67.    On August 7, 2023, Associate Provost Bertot wrote a memorandum stating there were no withdrawals of cases for tenure before consideration by the Campus APT Committees

during the 2022-2023 academic year, failing to acknowledge the withdrawal of Dr. Trevino's case and the events that followed.

68.     On August 25, 2023, Defendant University sought nominations for different committees of the Math Department. In violation of the Department's plan of organization and bylaws, the position of Equity Employment Officer was listed as only available to full professors, preventing Dr. Trevino from contributing to equity oversight.

69.     On  or about August 29, 2023, Professor Forni had a conversation with Levy in which Levy expressed his retaliatory intent to use his role as Chair to remove Dr. Trevino from the Math Department. This conversation was later reported in an email on September 5, 2023, to the University administration. Professor Forni wrote, "Prof. Levy is now claiming that Trevino should not be tenured at the Mathematics Department, even if his research, teaching and mentoring records are entirely satisfactory, and would otherwise secure his tenure promotion, since the complaint ruined his service record, otherwise excellent, by bringing controversy in the Mathematics Department…Prof. Levy explained the above mentioned views in a conversation we had on Tuesday, August 29th, 2023, in the Rotunda of the Math Building…[h]e disparaged Trevino's personality and called the complaint 'frivolous'…I was also informed by several colleagues that Prof. Levy approached them and other colleagues and made a similar case that Trevino should not be tenured at the Mathematics Department because of his filing a complaint or other unsubstantiated accusations of spreading lies about him…Prof. Levy is engaged in a conduct that  clearly  'discourages  someone  from  resisting  or  complaining  about  future discrimination'…[h]is conduct also creates a difficult, hostile work environment for myself and others which distracts from our work as teachers, scholars and mentors."  Professor Forni referred to his report to Nastase on February 8, 2023, regarding the threats made during the phone call with

Levy and highlighting the clear pattern of retaliation against Dr. Trevino with the clear goal of inhibiting Dr. Trevino's promotion.

70.    On September 11, 2023, Associate Dean Fourkas informed Dr. Trevino of the report made against Levy by Professor Forni and suggested Dr. Trevino request an outside observer to witness the tenure meetings and report to the Provost's Office. Associate Dean Fourkas also noted that Levy would not be serving the role of Chair during tenure proceedings and a substitute Chair would be appointed. Dr. Trevino stressed the need for an impartial substitute Chair given the retaliatory campaign commenced by Levy.

71.    On September 12, 2023, Dr. Trevino emailed Associate Dean Fourkas requesting an independent observer who would intervene on any inappropriate comments, as well as a supervisor to keep a record of the concerns raised during the tenure meeting.

72.    On September 18, 2023, a well-respected Principal Lecturer observed Dr. Trevino's teaching. He reported it as "one of the best classes I have ever visited." This report was included in Dr. Trevino's tenure file.

73.    On September 20, 2023, Dean Varshney appointed Professor Richard Wentworth, a close associate and direct report of Professor Levy, as substitute Chair for Dr. Trevino's tenure case.

74.    On September 29, 2023, Dr. Trevino reported his concerns about the upcoming promotion process to Vice President for Diversity and Inclusion Dr. Georgina Dodge. Dr. Trevino explained Levy's discriminatory actions, campaign of retaliation, and hostility toward Dr. Trevino's efforts to promote equity in the Department and University.

75.    On October 4 and 11, 2023, the APT committee met to discuss Dr. Trevino's tenure case without Dr. Trevino present. The Committee evaluated Dr. Trevino's research component as

above the threshold for tenure, his service and mentoring records were evaluated unanimously as outstanding for his career stage, and there was no criticism of his publication record or of his research accomplishments. It was presented that all external evaluators recommended promotion. Despite these qualifications, Chair of the Appointments, Promotion and Tenure Committee Professor Sandra Cerrai (who, according to the APT Guidelines, has "a particular responsibility" to ensure that "the discussion and evaluation of the candidate is impartial, fair, and unbiased") deliberately introduced bias against Dr. Trevino by claiming he had "a persecution complex." Cerrai also claimed Trevino's inclusion of a table displaying the teaching loads of junior faculty in lower-level courses amounted to disparagement of those colleagues' teaching records. The dossier the committee was meant to evaluate contained no complaints from Dr. Trevino. Since Professor Cerrai and Associate Dean Fourkas had discussed the potential negative effect of this table on the APT Committee a month before, Professor Cerrai had time to plan how she would present the table to the committee.

76.    During the same meeting, a member of the APT Committee suggested they vote not on the merits of their research, service, or teaching, but based on whether its members want the candidate as a colleague. Three members of the APT Committee questioned the sincerity of the external evaluators, who all provided positive reviews of Dr. Trevino, and one suggested his tenure application deserved a higher level of scrutiny because his PhD came from the University of Maryland. They also discussed the potential of negative perception from inconsistent promotion policies if they denied a candidate who received the CAREER award. The Provost's observer failed to intervene during any of the negative comments regarding Dr. Trevino's personality.

77.    On October 18, 2023, the Office of Faculty Affairs announced Levy as an expert speaker in a workshop titled "Fearless Unit Leadership: The Chair's Role in Successful APT and

AEP," citing his experience in managing challenging situations. Several professors contacted Associate Provost Bertot regarding the choice of speaker given Levy's discriminatory and retaliatory behavior and the suggestion of Dr. Trevino as a challenging case.

78.    On October 19, 2023, Wentworth informed Dr. Trevino that the APT Committee did not recommend him for tenure and that Wentworth would not be recommending him for tenure based on his research and teaching record. Several members of the APT Committee authored a "minority report," protesting the conclusions of the APT Committee, emphasizing the positive conclusion of the advisory subcommittee, the recommendations of the external evaluators, and summarizing the events that took place during the tenure meetings – including the retaliatory remarks against Trevino and the questioning of the sincerity of the external evaluators. This report would be sent to the Dean as part of Trevino's promotion file. Additionally, several other members of the APT Committee stated privately that they supported the minority report; however, feared retaliation from Levy if they signed.

79.    Despite the fact that Dr. Trevino had obtained very positive student evaluations in the year since his first attempt at promotion, including in lower-level courses, despite the fact that Dr. Trevino had been exclusively recommended for promotion for the second time external letters by experts chosen by the department, that is, despite Dr. Trevino having cleared the double standard for promotion set for him the previous year, in mid-October 2023, Professor Wentworth and Professor Cerrai submitted their negative recommendation to Dean Varshney.

80.    On November 20, 2023, Dr. Trevino became aware of letters written to Dean Varshney from mathematics professors worldwide expressing shock regarding the decision made by the Defendant University's Math Department concerning Dr. Trevino's tenure case. Dr. Trevino did not solicit these letters and made this clear to Associate Dean Fourkas.

81.    On December 14, 2023, Dr. Trevino emailed Associate Dean Fourkas expressing his continued concern that Professor Wentworth was not an unbiased substitute in his tenure case and emphasized the importance of the chair's recommendation given the bias from the APT Committee members.

82.    In late December 2023, the Dean's Office received reports of Levy's violations of Defendant University's equity in hiring guidelines. Specifically, Levy had made disparaging comments about a job candidate based on his country of origin essentially stating that said candidate was probably a sexual harasser because he was Chinese and leaving China. The Dean's Office failed to address and/or respond to the reports.

83.    On January 23, 2024, Dean Varshney remanded Dr. Trevino's tenure case back to the Math Department because he was unwilling to certify that there had not been any violations of due process. Professor Wentworth continued as Acting Chair for Dr. Trevino's case, despite the reported concerns.

84.    On January 24, 2024, Levy convened a faculty meeting in the Math Department. Levy first elaborated on a recently announced 27-million-dollar gift to the Department by the Brin family to support the operations of the Brin Research Center. Levy then announced that he was doing anything he could to oppose the University's attempt to address the inequitable hiring practices within the Department. When asked who was responsible for the intervention that he opposed, Levy stated, "equity, everything that comes with equity." Levy then stated that these were recent changes made by someone in the college. Dr. Trevino spoke up, stating that the guidelines had been in place for years. Levy responded that he received approval from the Dean's Office and Provost's Office every year to deviate from the University's equity in hiring practices and that following these guidelines would result in a worse department. At the same meeting, Levy also

asked the faculty how they would address professors with low student evaluations. Professor Denny Gullick stated that the Department does not emphasize an appreciation for teaching, only research. This statement was inconsistent with the explanation for Dr. Trevino's tenure denial.

85.    On January 29, 2024, Dr. Trevino reported Levy's intent to oppose the equity in hiring guidelines in an email to Vice President Dodge, Associate Provost Bertot, and Associate Dean Fourkas. Dr. Trevino raised concerns that this attitude affected not only hiring, but also tenure and promotions, and noted the correlation between announcing the multimillion-dollar gift and the hiring practices established an attitude of impunity to University protocols within the Math Department. Dr. Trevino addressed the many equity concerns he raised throughout the years that were consistently dismissed or ignored. Associate Dean Fourkas purportedly shared the email with Dean Varshney and University Counsel.

86.    In February 2024, the APT Committee met for a second evaluation of Dr. Trevino's tenure case. The meeting repeated many of the negative and pretextual claims from October 2023. Professor Wentworth and Professor Cerrai, who were leading the meeting, acted in an openly biased way against Dr. Trevino, for example by interrupting members of the committee speaking in favor of Dr. Trevino while allowing members opposing Dr. Trevino to complete their interventions.  Again, Cerrai's deliberately breached her "particular responsibility" to ensure "that the discussion and evaluation of the candidate is impartial, fair, and unbiased."

87.    In late February 2024, Professor Wentworth informed Dr. Trevino of the Department vote and stated he would not recommend Dr. Trevino for tenure on the basis of teaching and research. Dr. Trevino received overwhelming positive feedback in his Fall 2023 teaching evaluations. Defendant University informed Dr. Trevino and some of the authors of the minority report that no documents from the October 2023 meeting would be part of the record, and

that even the existence of the October meeting could not be mentioned in the February minority report. When one of the authors argued those events were necessary and crucial to include, Defendant University stated any mention from the October report, even those detailing illegal retaliation, would result in the minority report not being accepted. Several professors separately emailed Provost Rice to express concerns about the University's abrupt decision to have documents in Dr. Trevino's case be considered as non-existent and pointed out that the University's APT guidelines did not support Defendant University's position. Defendant University did not change its course of action.

88.    In March 2024, Dr. Trevino insisted that the documents from October not be excluded from the tenure dossier, arguing they showed bias, discrimination, and retaliation. These documents triggered the remand from the Dean and were therefore relevant. Associate Dean Fourkas responded that the remand restarts the process and nothing from previous meetings existed any longer. This was a clear violation of Defendant University's APT policy.

89.    On March 5, 2024, Associate Provost Bertot further retaliated against Dr. Trevino by reprimanding him for his communication to Associate Dean Fourkas, calling his complaint an unprecedented candidate intervention and referencing Dr. Trevino's complaint with the OCRSM and EEOC as reasons Dr. Trevino's case would not be discussed. Dr. Trevino responded by referencing the APT manual, which directs faculty with due process objections to bring their concerns to him in the Office of Faculty Affairs. Dr. Trevino was doing what the manual directed him to do. In response, Associate Provost Bertot refused to engage in any further communication with Dr. Trevino.

90.    On March 6, 2024, a Full Professor in the Mathematics Department delivered to Associate Provost Bertot a written report about an incident that occurred in September 2023.

Before the APT committee met to deliberate on Dr. Trevino's tenure case in October, a member of the APT Committee told this Professor that people were planning on voting Dr. Trevino down for tenure because of his civil rights complaint, and asked this Professor to join the conspiracy to deny Dr. Trevino tenure. This member asked the Professor to spread the word about it. The Professor was at first inclined to do as asked of them, but upon reading Dr. Trevino's file, the Professor thought it would be inappropriate, based on the merits of Dr. Trevino's file, to vote negatively. Associate Provost Bertot stated he would forward the Professor's written report to the Provost.

91.     On March 15, 2024, Dean Varshney certified the denial of Dr. Trevino's tenure, stating he did not find any violations of due process in the Department's review of Dr. Trevino which now, due to Defendant University's procedural ruling, excluded all materials from the October 2023 meetings that described incidents of prejudice and retaliation.

92.     On April 5, 2024, an APT Committee member stated to Dr. Trevino that people in the Department did not like him personally and that resulted in the denial of tenure.

93.     On April 15, 2024, Dr. Trevino submitted a request for an appeal to President Pines, citing discrimination, retaliation, and procedural violations.

94.     On May 28, 2024, Associate Provost Bertot distributed a memorandum to deans, associate deans for faculty, chairs, and directors, directing them not to discuss a candidate's case outside of APT meetings or outside the review process by disclosing any information to a candidate. Associate Provost Bertot threatened that anyone who breached confidentiality would be, at minimum, excluded from APT cases for the remainer of the academic year. This threat of retaliation contained no exceptions for disclosures that count as protected activity and is unsupported by the Defendant University's own Policy and Procedures on Appointment, Promotion, and Tenure of Faculty.

95.    On June 25, 2024, Pines granted Dr. Trevino an appeal on the grounds of substantive due process violations, but not on procedural violations. President Pines thus asserted that the eliminating of documents containing evidence of retaliation from Dr. Trevino's file is not a procedural violation, even though this is unsupported by the Defendant University's own policies. The Office of Faculty Affairs communicated to Dr. Trevino that no items procured from breaches of confidentiality would be included as part of the appeals process, preventing Dr. Trevino from opposing discriminatory and retaliatory behavior.

96.    To date, Defendant University continues to discriminate and retaliate against Dr. Trevino based upon his race and national origin, as well as his engagements in protected activity.

97.    Based upon the foregoing, Defendant University discriminated against Dr. Trevino based upon his race and national origin and retaliated against him following his engagements in protected activity when he complained about the disparate treatment, harassment, and retaliation to which he was subjected and/or opposed Defendant University's discriminatory employment practices. Defendant University treated Dr. Trevino differently as compared to similarly situated non-Mexican American employees, who did not complain about and/or oppose discrimination, with respect to their terms and conditions of employment. These actions of discrimination and retaliation substantially interfered with Dr. Trevino's employment.

## FIRST CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY
### (DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e)

98.    Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

99.    Defendant University's discrimination concerned activities protected by Title VII of the Civil Rights Act of 1964, Section 2000e-2.

100.    Title VII of the Civil Rights Act of 1964, Section 2000e-2, Section 703 states: "It shall be an unlawful employment practice for any employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

101.    Plaintiff is a member of a protected class pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-2, namely, Plaintiff is a Mexican American male.

102.    Plaintiff was qualified for a promotion and tenure as demonstrated by his exemplary performance and the multiple awards he received during his employment with Defendant University.

103.    As outlined herein, Defendant University and/or its agents intended to discriminate against Plaintiff on the basis of his race and national origin by subjecting him to disparate treatment in the terms and conditions of his employment as compared to similarly situated non-Mexican American employees. Defendant University subjected Plaintiff to disparate treatment by, among other things: providing him with unfavorable and higher course loads, and denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

104.    Defendant University and/or its agents subjected Plaintiff to adverse employment action by, among other things: denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

105.    As a direct and proximate result of Defendant University's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-3, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

106.    As a direct and proximate result of Defendant University's unlawful discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-2, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### SECOND CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY
### (DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000d)

107.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

108.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 USC § 2000d.

109.    Defendant University is an institution receiving Federal financial assistance within the meaning of 42 USC § 2000d.

110.    Plaintiff is a member of a protected class pursuant to Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, namely, Plaintiff is a Mexican American male.

111.    Plaintiff was qualified for a promotion and tenure as demonstrated by his exemplary performance and the multiple awards he received during his employment with Defendant University.

112.    As outlined herein, Defendant University and/or its agents intended to discriminate against Plaintiff on the basis of his race and national origin by subjecting him to disparate treatment in the terms and conditions of his employment as compared to similarly situated non-Mexican American employees. Defendant University subjected Plaintiff to disparate treatment by, among other things: providing him with unfavorable and higher course loads, and denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

113.    Defendant University and/or its agents subjected Plaintiff to adverse employment action by, among other things: denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

114.    As a direct and proximate result of Defendant University's unlawful conduct in violation of Title VI of the Civil Rights Act of 1964, Section 2000d, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

**THIRD CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY**
**(DISCRIMINATION IN VIOLATION OF MD. CODE ANN., STATE GOV'T**
**§ 20-606)**

115.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

116.    Defendant University's discrimination concerned activities protected by MD. Code Ann., State Gov't § 20-606.

117.    MD. Code Ann., State Gov't § 20-606(a) provides, in relevant part: "An employer may not: (1) refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of: (i) the individual's race…national origin...; (2) limit, segregate, or classify its employees…in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of: (i) the individual's race…national origin…."

118.    Plaintiff a member of a protected class pursuant to MD. Code Ann., State Gov't § 20-606(a), namely, Plaintiff is a Mexican American male.

119.    Plaintiff was qualified for a promotion and tenure as demonstrated by his exemplary performance and the multiple awards he received during his employment with Defendant University.

120.    As outlined herein, Defendant University and/or its agents intended to discriminate against Plaintiff on the basis of his race by subjecting him to disparate treatment in the terms and conditions of his employment as compared to similarly situated non-Mexican American employees. Defendant University subjected Plaintiff to disparate treatment by, among other things: providing him with unfavorable and higher course loads, and denying him leadership roles and

promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

121.    Defendant University and/or its agents subjected Plaintiff to adverse employment action by, among other things: denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

122.    As a direct and proximate result of Defendant University's unlawful conduct in violation of MD. Code Ann., State Gov't § 20-606(a), Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

123.    As a direct and proximate result of Defendant University's unlawful discriminatory conduct in violation of MD. Code Ann., State Gov't § 20-606(a), Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY**
**(DISCRIMINATION AND RETALIATION IN VIOLATION OF MD. CODE ANN.,**
**STATE GOV'T § 20-1202 AND PRINCE GEORGE'S COUNTY CODE § 2-222)**

124.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

125.    Pursuant to Md. Code Ann., State Gov't § 20-1202, "a person that is subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the

person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief."

126.     Defendant University's discrimination concerned activities protected by Prince George's County Code § 2-222.

127.     Prince George's County Code § 2-222 provides, in relevant part: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination."

128.     Plaintiff a member of a protected class pursuant to Prince George's County Code § 2-222, namely, Plaintiff is a Mexican American male.

129.     Plaintiff was qualified for a promotion and tenure as demonstrated by his exemplary performance and the multiple awards he received during his employment with Defendant University.

130.     As outlined herein, Defendant University and/or its agents intended to discriminate against Plaintiff on the basis of his race by subjecting him to disparate treatment in the terms and conditions of his employment as compared to similarly situated non-Mexican American employees. Defendant University subjected Plaintiff to disparate treatment by, among other things: providing him with unfavorable and higher course loads, and denying him leadership roles and promotional opportunities on the pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

131.     Defendant University and/or its agents subjected Plaintiff to adverse employment action by, among other things: denying him leadership roles and promotional opportunities on the

pretextual basis that he received one set of poor student evaluations and subjecting him to a higher standard of promotion criteria than similarly situated non-Mexican American employees.

132.    Defendant University would not have engaged in this conduct.

133.    Prince George's County Code § 2-222 prohibits retaliation.

134.    Defendant University's employment practices as alleged at length herein constitute an impermissible act of retaliation in violation of Prince George's County Code § 2-222. The stated reasons for Defendant University's conduct were not the true reasons but served as a pretext to conceal Defendant University's retaliatory animus against Plaintiff.

135.    Plaintiff engaged in protected activity on multiple occasions throughout 2020, 2021, 2022, 2023, and 2024 by complaining about discrimination and retaliation and/or opposing Defendant University's unlawful employment practices. Plaintiff also engaged in protected activity by filing a formal Charge of Discrimination with the EEOC in June 2023.

136.    Defendant University was aware of Plaintiff's engagements in protected activity as Plaintiff complained directly to University officials and filed a Formal Charge of Discrimination with the EEOC regarding the disparate treatment, harassment, and retaliation to which he was subjected based upon his race and national origin and related complaints.

137.    As fully demonstrated within this Complaint, Defendant University engaged in a course of retaliatory and adverse conduct against Plaintiff by, among other things: denying him leadership roles, promotional opportunities, and tenure directly after he complained about and/or opposed Defendant University's discriminatory employment practices, causing Plaintiff significant mental anguish and emotional distress.

138.    Defendant University took these adverse actions shortly after each of Plaintiff's engagements in protected activity.

139.     Defendant university would not taken these allegations had Plaintiff not engaged in this protected activity.

140.     As a direct and proximate result of Defendant University's unlawful conduct in violation of Prince George's County Code § 2-222, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

141.     As a direct and proximate result of Defendant University's unlawful discriminatory conduct in violation of Prince George's County Code § 2-222, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### FIFTH CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY
### (RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e)

142.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

143.     Title VII prohibits discrimination and retaliation.

144.     Title VII of the Civil Rights Act of 1964, Section 2000e-3(a) states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an

unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

145.    Defendant University's employment practices as alleged at length herein constitute an impermissible act of retaliation in violation of Title VII. The stated reasons for Defendant University's conduct were not the true reasons but served as a pretext to conceal Defendant University's retaliatory animus against Plaintiff.

146.    Plaintiff engaged in protected activity on multiple occasions throughout 2020, 2021, 2022, 2023, and 2024 by complaining about discrimination and retaliation and/or opposing Defendant University's unlawful employment practices. Plaintiff also engaged in protected activity by filing a formal Charge of Discrimination with the EEOC in June 2023.

147.    Defendant University was aware of Plaintiff's engagements in protected activity as Plaintiff complained directly to University officials and filed a Formal Charge of Discrimination with the EEOC regarding the disparate treatment, harassment, and retaliation to which he was subjected based upon his race and national origin and related complaints.

148.    As fully demonstrated within this Complaint, Defendant University engaged in a course of retaliatory and adverse conduct against Plaintiff by, among other things: denying him leadership roles, promotional opportunities, and tenure directly after he complained about and/or opposed Defendant University's discriminatory employment practices, causing Plaintiff significant mental anguish and emotional distress.

149.    Defendant University took these adverse actions shortly after each of Plaintiff's engagements in protected activity.

150.    As a direct and proximate result of Defendant University's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-3, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

151.    As a direct and proximate result of Defendant University's unlawful and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-3, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### SIXTH CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY
### (RETALIATION IN VIOLATION OF 42 U.S.C. § 2000d)

152.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

153.    Title VI prohibits retaliation.

154.    Defendant University's employment practices as alleged at length herein constitute an impermissible act of retaliation in violation of Title VI. The stated reasons for Defendant University's conduct were not the true reasons but served as a pretext to conceal Defendant University's retaliatory animus against Plaintiff.

155.    Plaintiff engaged in protected activity on multiple occasions throughout 2020, 2021, 2022, 2023, and 2024 by complaining about discrimination and retaliation and/or opposing Defendant University's unlawful employment practices. Plaintiff also engaged in protected activity by filing a formal Charge of Discrimination with the EEOC in June 2023.

156.    Defendant University was aware of Plaintiff's engagements in protected activity as Plaintiff complained directly to University officials and filed a Formal Charge of Discrimination with the EEOC regarding the disparate treatment, harassment, and retaliation to which he was subjected based upon his race and national origin and related complaints.

157.    As fully demonstrated within this Complaint, Defendant University engaged in a course of retaliatory and adverse conduct against Plaintiff by, among other things: denying him leadership roles, promotional opportunities, and tenure directly after he complained about and/or opposed Defendant University's discriminatory employment practices, causing Plaintiff significant mental anguish and emotional distress.

158.    Defendant University took these adverse actions shortly after each of Plaintiff's engagements in protected activity.

159.    Defendant university would not taken these allegations had Plaintiff not engaged in this protected activity.

160.    As a direct and proximate result of Defendant University's unlawful conduct in violation of Title VI of the Civil Rights Act of 1964, Section 2000d, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANT UNIVERSITY
### (RETALIATION IN VIOLATION OF
### MD. CODE ANN., STATE GOV'T § 20-606(f))

161.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

162.    MD. Code Ann., State Gov't § 20-606(f) prohibits retaliation.

163.    MD. Code Ann., State Gov't § 20-606(f) provides, in relevant part: "An employer may not discriminate or retaliate against any of its employees…because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle."

164.    Defendant University's employment practices as alleged at length herein constitute an impermissible act of retaliation in violation of MD. Code Ann., State Gov't § 20-606(f). The stated reasons for Defendant University's conduct were not the true reasons but served as a pretext to conceal Defendant University's retaliatory animus against Plaintiff.

165.    Plaintiff engaged in protected activity on multiple occasions throughout 2020, 2021, 2022, 2023, and 2024 by complaining about discrimination and retaliation and/or opposing Defendant University's unlawful employment practices. Plaintiff also engaged in protected activity by filing a formal Charge of Discrimination with the EEOC in June 2023.

166.    Defendant University was aware of Plaintiff's engagements in protected activity as Plaintiff complained directly to University officials and filed a Formal Charge of Discrimination with the EEOC regarding the disparate treatment, harassment, and retaliation to which he was subjected based upon his race and national origin and related complaints.

167.    As fully demonstrated within this Complaint, Defendant University engaged in a course of retaliatory and adverse conduct against Plaintiff by, among other things: denying him leadership roles, promotional opportunities, and tenure directly after he complained about and/or opposed Defendant University's discriminatory employment practices, causing Plaintiff significant mental anguish and emotional distress.

168.    Defendant University took these adverse actions shortly after each of Plaintiff's engagements in protected activity.

169.    Defendant university would not taken these allegations had Plaintiff not engaged in this protected activity.

170.    As a direct and proximate result of Defendant University's unlawful conduct in violation of MD. Code Ann., State Gov't § 20-606(f), Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

171.    As a direct and proximate result of Defendant University's unlawful and retaliatory conduct in violation of MD. Code Ann., State Gov't § 20-606(f), Plaintiff suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

**EIGHTH CAUSE OF ACTION AGAINST**
**DEFENDANTS LEVY, CERRAI, and WENTWORTH**
**(RETALIATION IN VIOLATION OF 42 U.S.C. § 1983)**

172.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

173.    The Civil Rights Act of 1871 provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U. S. C. §1983.  §1983 also prohibits retaliation.

174.    At all relevant times, Levy, Cerrai, and Wentworth were "persons," as contemplated by 42 U. S. C. §1983.

175.    Defendant University's employment practices as alleged at length herein constituted an impermissible act of retaliation in violation of state and federal law.  Plaintiff engaged in protected activity on multiple occasions throughout 2020, 2021, 2022, 2023, and 2024 by complaining about discrimination and retaliation and/or opposing Defendant University's unlawful employment practices. Plaintiff also engaged in protected activity by filing a formal Charge of Discrimination with the EEOC in June 2023.

176.    Defendants Levy, Cerrai, and Wentworth were each aware of Plaintiff's engagements in protected activity.

177.    Levy, Cerrai, and Wentworth individually and collectively intended to retaliate against Plaintiff for Plaintiff's engagement in protected activity of lodging a complaint of racial discrimination against Levy.

178.    Levy, Cerrai, and Wentworth retaliated against Plaintiff for exercising his right to free speech under the First Amendment of Constitution of the United States.

179.    Plaintiff's complaint of racial discrimination by Defendant University and Levy addressed a matter of public concern.

180.    Plaintiff suffered an adverse employment action—the denial of tenure.

181.    Levy, Cerrai, and Wentworth individually and collectively retaliated against Plaintiff for Plaintiff's engagement in protected activity of lodging a complaint of racial

discrimination against Defendant University and Levy, by unduly influencing and interfering in the tenure process to such an extent that it lead to the denial of tenure.

182.    Levy, Cerrai, and Wentworth would not have unduly influenced and interfered in the tenure process to such an extent that it lead to the denial of tenure had Plaintiff not engaged in protected activity.

183.    Levy, Cerrai, and Wentworth's actions also interfered with Plaintiff's freedom to make and enforce contracts as protected by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

184.    Defendant University and Plaintiff entered into a contract for his employment that also set forth the procedure for earning tenure.

185.    Plaintiff possessed a protected property interest in that employment contract and the granting of tenure.

186.    Levy, Cerrai, and Wentwoth individually and collectively interfered with Plaintiff's protected property interest in his employment contract and tenure by unduly influencing and interfering in the tenure process to such an extent that it lead to the denial of tenure.

187.    At all times, Levy, Cerrai, and Wentworth were acting under color of the laws, customs, and usages of the State of Maryland within the meaning of 42 U. S. C. §1983.

188.    Levy, Cerrai, and Wentworth's actions deprived Plaintiff of rights protected by the Constitution of the United States, its First and Fourteenth Amendments, and federal law, including, but not limited to, 42 U.S.C. § 2000d, 42 U.S.C. § 2000e.

189.    As a direct and proximate result of Defendant's unlawful conduct in violation of 42 U. S. C. §1983, Plaintiff has suffered and continues to suffer monetary and/or economic damages,

including, but not limited to, loss of past and future income, compensation, and benefits for which he is entitled to an award of monetary damages and other relief.

190.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of 42 U. S. C. §1983, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

A.    A declaratory judgment that actions, conduct, and practices of Defendant complained of herein violate the laws of the United States and the State of Maryland;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct.

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff all non-monetary and/or compensatory harm, including but not limited to, compensation for mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress; and

E.    An award of damages for any and all other monetary/non-monetary losses suffered by Plaintiff in an amount to be determined at trial;

F.    An award of punitive damages in an amount to be determined at trial;

G.    The costs and disbursements of this action; and

H.    Such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

**PLAINTIFF RODRIGO TREVINO DEMANDS A TRIAL BY JURY.**

Dated:  New York, New York
          November 12, 2024

FREEDMAN LAW, LLC


By:          /s/  Lindsay. A. Freedman
          Lindsay A. Freedman
          10015 Old Columbia Road,
          Suite B-215
          Columbia, Maryland 21046
          Phone: (410) 290-6230
          Fax: (410) 290-5285
          Email: laf@freedlawfirm.com

WHITE, ROSE & HILFERTY

By:          _____
          Michael P. Hilferty
          Samantha E. Hudler
          757 Third Avenue, 20th Floor
          New York, NY 10017
          Phone: (917) 633 5760
          Fax: (646) 690-8897
          Email: mph@nycjobattorney.com

          *Attorneys for Plaintiff, Rodrigo Trevino*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**RODRIGO TREVINO**,
4013 8th St NW
Washington, DC 20011


       Plaintiff,

v.

**UNIVERSITY OF MARYLAND, COLLEGE PARK**; **DORON LEVY**; **SANDRA CERRAI**; and **RICHARD WENTWORTH**,
1101 Kirwan Hall
College Park, MD 20742,
Prince George's County,

       Defendants.

Case No.:_____

---

### VERIFICATION

      **RODRIGO TREVINO**, pursuant to the provisions of 28 U.S.C. 1746, declares the following under penalty of perjury that the foregoing is true and correct:

1.     I am the Plaintiff herein.

2.     I have read the foregoing Complaint and know the content thereof, that the same is of my own knowledge except as to the matters therein stated upon information and belief; and that as to those matters, I believe the same to be true.

Executed:    Washington, D.C.
            November 12, 2024

_____
RODRIGO TREVINO