EEOC Form 5 (5/01)

| *Amended* CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **AMENDED**<br>531-2023-04245 |

Prince George's County Office of Human Rights/ Maryland Commission on Civil Rights  and EEOC
*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Rodrigo Trevino | (512) 466-1643 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 4013 8th St NW | Washington, DC 20011 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| University of Maryland | 10,000+ | 713-753-2000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1101 Kirwan Hall | College Park, MD 20742-4015 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                Latest
9/6/2022

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

1. I am a Mexican American/Latino male. I came to the United States from Mexico was I was 15 years old. Since 2017, I have been employed as an Assistant Professor in the Math Department at the University of Maryland ("University"). In October 2022, I was discriminated against when my Department Chair refused to recommend me for tenure. I was treated worse and held to a higher standard than my non-Mexican/Latino peers. I was also retaliated against for opposing discrimination hiring practices against minorities and promoting diversity, equity, and inclusion at the University.

2. Throughout my tenure, I have received accolades and praise from my students and supervisors regarding my teaching and research. In April, 2022, I was given a new contract with a higher salary to retain me from leaving to another university. In 2022, the Dean told expressed that the University loved me and asked that I please stay at UMD, when my wife and I received job offers from another school. I turned the offer down based on the Dean's representations and the reasonable expectation of continued promotional opportunities. Over the next four years, I was also awarded $5,000.00 per year for research expenses.

3. I am frequently published in highly-respected academic journals. In the spring 2023 semester, I was nominated and recognized with the Champion of Women Award by the University President's Commission on Women's Issues. In December 2021, I was awarded a brand new $500,000.00 National Science Foundation (NSF) Grant on behalf of my work with the University, with a starting date of June 2022. According to the NSF, this grant is the "most prestigious awards in support of early-career faculty who have the potential to serve as academic role models in research and education and to lead advances in the mission of their department or organization." Prior to my tenure application, my Department Chair admitted that this NSF Grant should make it "easy for him" to recommend me for tenure." In July 2022, I was selected to receive a Teaching and Learning Grant from the Provost's Office. This grant money will help transform aspects of undergraduate teaching in the Mathematics Department. In mid December 2022, my Dean nominated me to be recognized at the Maryland Research Excellence Celebration on March 28, 2023.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>3/11/24     *[signature]*<br>Date          Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT  *[signature]* 03/4/24<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*<br><br>KATHLEEN SANTOS<br>Notary Public - State of Maryland<br>Howard County<br>My Commission Expires Sep 29, 2027 |

KATHLEEN SANTOS
Notary Public - State of Maryland
Howard County
My Commission Expires Sep 29, 2027

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | 531-2023-04245 |

Prince George's County Office of Human Rights/ Maryland Commission on Civil Rights   and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

4. During my employment with the University, I have consistently opposed discriminatory practices and advocated for diversity, equity, and inclusion. In 2019, I raised concerns about a new high school outreach program that only worked with affluent schools, including one private, all-boys school. I said we needed to work with boys and girls equally and preferably from less privileged backgrounds. My Department Chair, Doron Levy (Professor and Chair of the Department of Mathematics)("Department Chair" or "Professor Levy"), aggressively dismissed my concerns. In early 2020, I opposed my Department's discriminatory hiring process, which had failed to implement DEI practices. My complaint noted that our Department was only 10% female, and "The longer we wait to implement structural change the harder it will be to get out of the hole." I also complained to Professor Levy that my Department failed to retain or promote an excellent female scholar, Lise-Marie Imbert-Gerard, who was criticized for negotiating her salary as a woman in a heavily male-dominated field, while men were praised for the same. I stated, "From what I understand of the law, these criticisms constitute gender discrimination because they are negative evaluations of women engaging in behavior (negotiation) that would be tolerated or even prized in a man. The gender discrimination might even be illegal, since these negative appraisals of her character have been used, sometimes in the place of her or her Latino husband's scholarly records, to make decisions about a hiring and retention decision." Professor Levy quickly dismissed my DEI recommendations and concerns. In 2022, I raised concerns about a candidate for a Chaired Position in the Department, who had made publically discriminatory remarks, requesting a meeting with Professor Levy and Richard Wentworth (Chair of Hiring Committee). They completely ignored my concerns and I have hard evidence to support these claims, including email correspondence.

5. Based on my outstanding teaching and research record, I applied for a promotion and tenure with the University at the end of May 2022. Unfortunately, in the end of October 2022, my Department Chair and the Department blocked my promotion and told me he would not recommend me for tenure, which would mean being denied tenure from the University if I did not immediately withdraw. I believe I was discriminated against (held to a different standard than my non-Latino/non-Mexican peers), and retaliated against for my discrimination complaints.

6. On September 9, 2022, Professor Levy met with me regarding my tenure/promotion application. He admitted that all the letters in my application/tenure dossier recommended me for tenure, but nevertheless suggested I withdraw from the tenure process. On or about October 25, 2022, Professor Levy urgently requested a follow-up meeting. In this meeting, he explained that he and the Department would not support me for tenure. His reasoning was based on very low student feedback data from a single course, specifically from a single batch of student evaluations during the spring 2022 semester, having to do with Omicron-related accommodations as I was trying out strategies to enable remote learning. However, the University Faculty Affair guidelines make clear that student course evaluations should not on their own, be used to make any major decisions about a tenure candidate. In any event, my student evaluations were positive overall, including positive evaluations from numerous graduate level classes, upper level classes, honors classes, and lower-level lectures.

7. Professor Levy and the Department held me to a higher standard for tenure evaluation than my non-minority colleagues. They blocked my tenure solely because of evaluations from one lower-level course (MATH 246), even though my Department Chair was fully-aware of the circumstances regarding that course, which I successfully taught multiple other times. Non-Latino professors received tenure in the Department, despite having not received purely positive student evaluations in a single course. Moreover, the University's Appointment, Promotion and Tenure Manual acknowledges that the lower level, large lectures are more difficult to secure great student evaluations.

8. Under Levy's leadership, I had been singled out as a minority (Latino/Mexican) and was the only pre-tenure, track faculty member required to regularly teach these difficult lower-level lectures. No non-Latino professor ever had to teach these classes more than once, yet I was required to teach the classes four (4) times. I was the only person in the Department who went up for tenure review at UMD, being assigned this type of class more than once. I believe I was consistently required to teach these lower-level undergraduate classes because the Department viewed me as a "workhorse," based on prejudicial stereotypes against Latinos. It is a hurtful stereotype about Mexicans that we are only valuable for our labor and not our intelligence. I was treated worse than other tenure-track faculty, being repeatedly forced to teach these less desirable, large-scale, lower-level lectures, as the sole Mexican American faculty member in the Department. My Department Chair had responsibility over my course assignments.

9. Evidence that the department was satisfied with my overall teaching performance in Math246 is that I was appointed Course Chair in the Fall of 2022 (the very semester I was denied a tenure recommendation). Being Course Chair involves writing the exam for all sections of the course and mentoring teaching staff. Thus, any reference to my performance teaching Math246 in the Spring of 2022 is just pretext, and I was refused a tenure recommendation from my department and chair on discriminatory grounds.

10. There was no other legitimate, non-discriminatory explanation for the worse treatment and expectations. Professor Levy and the University refused to recommend me tenure as a form of discrimination as a Latino/Mexican professor, and retaliation for my recent complaints about the lack of diversity and discriminatory hiring practices. Professor Levy had expressed direct frustration with my complaints and communicated opposition to my diversity advocation, once claiming it amounted to discrimination against the boys at Georgetown Prep, even though I was only nothing that an all-boys private school was not the ideal group to be only one of two schools selected for a college credit-granting high school program.

11. Based on my impressive academic publication record, recent retention, praise from the Dean, competitive grants, stellar reviews in numerous courses from colleagues and students, it is inconceivable that I would be denied tenure based on mixed student evaluations from a single lower-level undergraduate course, which I had been asked to chair and teach multiple times. This is clearly a false and pretextual reason to deny me tenure/promotional opportunities. I received numerous letters, all supporting my tenure, in addition to my impeccable academic credentials. *See attached, Continued - p. 3-7*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. <br><br> 3/11/24 <br> Date    Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT <br><br> 03/11/24 <br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE <br> *(month, day, year)* <br><br> KATHLEEN SANTOS <br> Notary Public - State of Maryland <br> Howard County <br> My Commission Expires Sep 29, 2027 |

12. In October, 2022, my department voted against me for tenure, and my department chair, Professor Levy, told me to withdraw my application, because he would not support my case to the college that year. Levy and the Department rejected my tenure for discriminatory reasons and because of my efforts to improve equity in hiring, graduate admissions, and speaking invitations.

13. Professor Levy has not held any other tenure candidate in the department to the standards to which he held me (regarding teaching, especially). In refusing to support me for tenure on October 2022, Professor Levy told me that I would have to secure an entirely new set of letters of recommendation the following year. Since the ones I had already secured had **all** recommended that I be promoted (according to Prof. Levy himself), Professor Levy hereby ensured that *I would have to secure twice as many letters of recommendations than any other candidate for tenure has had to secure*, holding me again to a higher standard for promotion than other candidates.

14. My academic career has been effectively destroyed and irreparably damaged because of these discriminatory and retaliatory practices — treating me worse than my non-Latino peers.

15. On November 14, 2022, I filed a discrimination and retaliation complaint with the Office of Civil Rights and Sexual Misconduct (OCRSM) at the University regarding disparate treatment and unlawful retaliation. Unfortunately, the University did not investigate my complaint in good faith, and no action was taken. I filed a detailed appeal noting the investigator's failure to address any of my discrimination/retaliation evidence. Instead, the University regurgitated patently false claims made by my Department Chair without any scrutiny. The written record of my excellent teaching history, scholarship, recommendations, awards, grants, and evidence of my Department Chair's animus towards me for supporting DEI initiatives, was not considered by the University — even though it directly contradicted the false and pretextual reasons for not recommending tenure.

16. Furthermore, I was refused any review of the procedural errors involved in my tenure case by the associate provost of faculty affairs. He said he was refusing because there has already been a discrimination investigation into that tenure review decision, despite being informed that there were procedural/substantive errors in my case above and beyond matters of discrimination.

17. Following my discrimination complaint, Professor Levy continues to make derogatory comments about me to my peers, further poisoning the well against me for future professional opportunities. *While speaking with my Math Department colleagues — directly involved in the promotional process — he implied I am crazy and unworthy of tenure because I filed the discrimination complaint. He has made these comments repeatedly since February 2023.*

18. In fact, I learned that Professor Levy engaged in a concerted campaign to retaliate against me for my complaints and destroy my reputation in the Math Department. Professor Levy requested to speak with a colleague of mine in the Math Department regarding an unnamed subject. *During the call, Levy threatened to sue me and asked this colleague to intervene to persuade me to stop talking and stop raising any further complaints. Levy threatened to sue me for damages and admitted that he even checked with the University to see if this was considered retaliation*. He knew his actions were wrong. *Professor Levy further acknowledged during the conversation that I might become unemployable in academia as a consequence of him coming after me and suing*

*me.* He was angry because he believed my complaint could impact his own job security. As a result, he went on the offensive to destroy my reputation.

19. On or about February 8, 2023, this Math colleague emailed the University directly regarding his concerns about this conversation and retaliation against me. No action was taken by the University to protect me.

20. On June 16, 2023, I filed my initial EEOC Complaint regarding race discrimination, national origin discrimination, and retaliation. Levy and the University learned about my EEOC Complaint shortly thereafter.

21. Over the summer of 2023, in response to my discrimination and EEOC complaints, *Professor Levy continued his unrelenting campaign to destroy my career and reputation within the Math Department at the University of Maryland.*

22. On or about August 29, 2023, *Professor Levy told one of my colleagues that because of my complaint, I did not deserve to be tenured within the Mathematics Department, despite my strong research, teaching, and mentoring records.* Levy expressly stated that my complaints ruined my service record (which was otherwise excellent), since it brought controversy to the Math Department.

23. During this time period, I learned that my *Mathematics Department colleagues were directly being told by Levy that I should not be tenured at the Mathematics Department because I filed the complaint and made "unsubstantiated accusations".*

24. On or about September 5, 2023, one of these Mathematics Department colleagues wrote directly to John T. Fourkas (Associate Dean for Faculty Affairs and Graduate Education) regarding this transparent retaliation. His email stated:

> *Prof. Levy is engaged in a conduct that clearly "discourages someone from resisting or complaining about future discrimination."*
>
> His conduct also creates a difficult, hostile work environment for myself and others which distracts from our work as teachers, scholar and mentors. His conduct affects the experience of some of our postdocs (at least one of them came forward to me expressing discomfort) and damages the reputation of our Mathematics Department in the mathematical community (colleagues approached me at conferences expressing dismay and concern). I would like to recall that Prof. Levy engaged in verbal threats against Trevino in a telephone call on February that I reported in an email to Angela Nastase on February 8th, 2023 (email reception acknowledged by Joshua Singer).
>
> It was an extremely shocking experience for me, which made me seriously consider looking for another job.
>
> *Prof. Levy's conduct is therefore not an isolated incident but follows a long term pattern of retaliation against Trevino with the clear goal of convincing*

*RT*

*sufficiently many colleagues in the Mathematics Department to vote against his
promotion.*

25. On or about September 29, 2023, Professor Levy sent an email to the department of mathematics, further reducing my chances of gaining tenure. ***This email was sent just days before the faculty would meet to discuss my tenure***. In reference to the Math Department's commitment to fostering an atmosphere of respect and collegiality, he said, ***"there are members of the department that seem to be unaware of it, as suggested by their actions."*** The Math Department knew he was talking about me because of my complaints and his repeated negative comments about my future with the University because of those complaints. He was further sending a message not to support me.

26. A Math Department colleague again contacted the University to complaint about the obvious retaliation. He wrote to the Faculty Dean, ***"I find [the sentence above], sent to the whole faculty, problematic per se, and to send it a few days before the meeting to discuss Trevino's promotion does not help the fairness of the process.***"

27. In September or October 2023, Professor Richard Wentworth, a close friend and associate of Professor Levy, was appointed to serve the role of acting chair for my promotion case. I had also complained directly to Professor Wentworth regarding the Department's anti-DEI behavior, which was not well-received. I immediately expressed reservations regarding this assignment, as he was conflicted and biased. It was obvious that he was going to rubber stamp Levy's decision to deny me tenure.

28. On October 19, 2023, I was further discriminated against and retaliated against by being denied tenure by the Mathematics Department and the acting chair over the promotion case. The acting chair executed Professor Levy's (his close associate) campaign of retaliation against me. My teaching record, letters of recommendations, and reach should have qualified me for tenure like my similarly situated non-Latino/Non-Mexican peers. This was also the culmination of Professor Levy's year-long campaign to retaliate against me and destroy my career at the University of Maryland because I filed EEO complaints against him.

29. Following this decision, my tenure case was placed under review and remanded back to the Mathematics Department for reconsideration by the Dean of my College. ***I believe this remand occurred because the University knew that I had been unlawfully retaliated against and discriminated against.*** They required the Department to re-do the meetings and the vote because a violation in due process occurred (or evidence was revealed) at the October meetings, and was recorded in the documents pertaining to that meeting – including a Minority Report.

30. In the interim, Professor Levy engaged in further problematic attacks against diversity, equity, and inclusion practices at the University. On January 24, 2024, we had a faculty meeting in which Professor Levy spoke for 45 minutes, spending a substantial amount of time on his issues with diversity and equity policies in hiring, and his objections to policies purportedly instituted by new equity officers at the University. ***He openly stated that he and the department would oppose the university's equity and diversity policies in the Department***.

31. During the January 24th faculty meeting, I raised my hand and pointed out that equity guidelines were not introduced recently or by anyone. I pointed out that these guidelines have been in place for years, and that most of the departments simply follow them. Professor Levy was not happy that I objected to his anti-DEI remarks (engaging in protected activity in front of the entire faculty).

32. On January 29, 2024, I followed up with an email to the Vice President for Diversity and Inclusion, the Associate Provost for Faculty Affairs, and the Associate Dean for Faculty Affairs at CMNS, further lodging my concerns regarding Professor Levy's anti-diversity, equity, and inclusion proclamations. I stated, "**I find it very distressing that Doron Levy announced that the math department was going to defy 'equity, everything that comes with equity' the day after the Dean of my college remanded my tenure decision back to the department because (I assume) he deemed there to be a shortcoming in the due process my case received…there are good reasons to believe that many of my colleagues also view the dean's remanding of my tenure case as an equity-driven interference from above. If they adopt Doron's attitude that we *must* resist equity when it comes to hiring guidelines, then why wouldn't they apply Doron's directive to other APT matters and guidelines- like the remanding of my tenure case?**"

33. During the faculty meeting on January 24, Professor Levy announced a recent $27 million gift to the Math Department, which he helped bring in. I believe this massive donation further emboldened Levy and is the reason the University supports and defends him, despite his anti-DEI rhetoric and retaliation. His anti-diversity rhetoric was the same problematic and discriminatory beliefs that I had previously complained about in 2020 and 2021.

34. On February 22, 2024, I received notification that the department of mathematics was not going to recommend me for tenure. Once more, there is no question that my tenure dossier should have qualified me based on past reviews of similarly situated non-Latino/non-Mexican candidates. Instead, if the dean accepts the recommendation, I will soon be terminated by the University due to the failure to obtain tenure. Once more, the acting chair over my promotional case, a close associate of Professor Levy, recommended against awarding me promotion, single-handedly blocking my promotion case to advance to the next level, and thereby again executing Professor Levy's (his close associate) campaign of retaliation against me for him.

35. I was discriminated and retaliated against, and treated worse (held to a different standard), than non-Latino/non-Mexican pre-tenure-track faculty, including other professors such as Christian Zickert, Kanigowski, Darvas, and De Rosa, among others. These individuals were all treated more favorably than me, were only required to teach one lower-level lecture (at most), and were recommended for promotion to ranks of associate and full professors with tenure with similar or worse teaching and research records, and were only asked to secure one set of letters of recommendation, when I was asked to secure twice as many. This very academic year (2023-24), the Department and chair voted Christian Zickert (white) as **full** tenured professor – the highest rank - with fewer research and teaching credentials than I had this year, when I was denied an associate-level promotion.

Rodrigo Trevino – Amended Charge of Discrimination (Form 5)
Continued Page 7 of 7

36. I believe I have been discriminated against and forced to endure a hostile work environment based on my race (Latino) and National Origin (Mexican) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Maryland Fair Employment Practices Act (State Government Article - Title 20) ("MFEPA"), and the Prince George's County.

37. Additionally, the University illegally retaliated against me in violation of Title VII, MFEPA, and the Prince George's County Code, for opposing race and gender discrimination in the University's hiring and personnel practices, and retaliating against me for my discrimination and EEOC complaints by denying me tenure/promotional opportunities, and making derogatory comments about me (retaliatory harassment) further impeding my ability to receive promotional opportunities.

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    FORM NUMBER/TITLE/DATE.  EEOC Form 5, Charge of Discrimination (5/01).

2.    AUTHORITY.  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117.

3.    PRINCIPAL PURPOSES.  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    ROUTINE USES.  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII or the ADA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.